Pamela Breedlove Good afternoon. May it please the court, I'm Pamela Breedlove and I represent former officer Pat Hensley. In this case, Chief Shaw, who was chief of police in the Shreveport Police Department, did not have any reasonable, articulated need to order an invasive procedure to draw blood from my client to determine whether or not Officer Hensley had taken any drugs. It's undisputed that my client was scared of needles. Undisputed. He didn't want to take this test. And he consented to give a breathalyzer and urine sample. Chief Shaw did not, admitted that he didn't know, first off he admitted he'd never ordered a blood test of any officer before. He admitted that he didn't know what it would test for, versus what you could get from urine, versus what you could get from blood. But more importantly, back when this was going on... So is it your position that you could get the same thing, you could test for all the same things in urine that you could get in a blood test? Based on... I guess it's a... There's no evidence one way or the other, Your Honor. Sorry, what? I'm sorry, there was no true evidence one way or the other. But the issue here, Your Honor, is Chief Shaw didn't believe the guy was on drugs. What he told the Civil Service Board, the Shreveport Civil Service Board, shortly after it happened, was he, quote, he believed Officer Hensley had been driving a marked police unit while under the influence of alcohol. And he took that seriously. He told us on two different... He also told them he believed he was under the influence of alcohol. He told the Civil Service Board that twice. There's no evidence that anybody ever told Chief Shaw that they thought my client might be under the influence of drugs. And since all the tests came back negative, he obviously wasn't. The lieutenant on site smelled alcohol on my client's breath. That's undisputed. Did he deny that he was under the influence of alcohol? When he was sitting there being under arrest, Your Honor, he did not want to be arrested. He said he did not have anything to drink other than alcohol. He was in custody at this time. He wasn't even driving. Somebody called and said they saw a police officer driving a vehicle after they smelled alcohol. They go to his house. They investigate. They place him in cuffs. They arrest him for DWI. Before he can get bonded out, the chief interrupts the bonding process to start an IA investigation. Without him letting the officer talk to an attorney, which under state civil service laws, he has a right to have an attorney for investigations. Didn't let him do that. Took him to...had his officers take him to the hospital in handcuffs while in custody and said, you take the test. He was coerced into taking it. Take the test or you can be terminated. That's undisputed that those things were told to him. The district court agreed that there was issues of fact whether he ever consented to a blood test. The evidence actually shows he didn't. He did not want to. He did not want to. He agreed to have a urinalysis and a breathalyzer after he was read his garrity rights. Once they took him away from the jail, although he was still in custody, and they gave him his garrity rights so it couldn't be used in any criminal proceedings, he then agreed, I'll take a breathalyzer, I'll take the urine test, but I don't want a needle in me. They did it anyway. And there was no grounds to...there's no reasonable suspicion to believe he was on drugs. What was the conduct reported that led to somebody showing up? That somebody...he went to somebody's house, they smelt liquor on his breath, and he drove the vehicle away. And he had slurred speech and a disturbed gait when he was walking? He did. I don't know that he's the gait. I can't pronounce that word. The eye test, he did fail that some. He refused the breathalyzer before he was arrested. After he was read his garrity rights, then he agreed to do a breathalyzer. He had trouble reciting the alphabet? He skipped two letters. Yeah, most adults wouldn't have a problem with that, I would think. Well, if they're under the influence of alcohol, they would. That's what that test is used for. And that's what everybody suspected. They suspected he was under the influence of alcohol. Well, I guess my problem, counsel, is if I'm the chief of police, I'm concerned about the safety of the citizens and my employees who are driving around in police cars, exhibiting at least some erratic behavior, and then you ask him about his consumption of alcohol, and he just flatly denies it. Irrespective of what the field sobriety test was showing, he flatly denies it. And so wouldn't it just be prudent to take some blood to see? He says, it's not alcohol, whatever's wrong with me, and clearly something's wrong, and whatever's wrong with me, it's not alcohol. So isn't it prudent then to get some blood to see if maybe it's something else? Breathalyzer doesn't answer his question because he's denying that it's alcohol. But the breathalyzer takes a really quick point. First off, it takes a really quick time. Second off, the urine test he agreed to also tests for drugs, and they tested it for drugs. So he consented to giving them the drug test that they needed from his urine. He admitted to have taken NyQuil, and he admitted to taking allergy pills. They smelled alcohol on him. They believed, apparently correctly, that he had been under the influence of alcohol. Even though they had not personally observed him driving his vehicle, they still arrested him for DWI. While he's still in there. You don't deny that he was driving it. I don't deny that that's what the evidence is. I don't know whether he had anything to drink between the time he parked that car and the police got there. So whether or not he was out drunk when he was driving that car, I can't tell you, Your Honor, and the evidence doesn't show that. The issue is whether or not, first off, state of Louisiana has a public employee drug testing statute that requires any drug screening to be pursuant to written policies. And the city of Shreveport has a written policy, and so does the Shreveport Police Department. And both the Shreveport Police Department's general order and the city's written policy require the chief to contact the city HR. And that is the issue. A city employee in city HR might know the difference that the chief didn't understand. The chief is just saying, take blood, take urine, take a breathalyzer, even though I've never asked any other officer to give blood before, but get it from you, even though you're terrified of needles, you give up blood, even though everybody believes you're drunk. And there was no great exigency. If you think he's drunk, you get that breathalyzer, those results are going to be back very quickly. At that point, you're going to know and would have known that he was drunk. And sticking a needle in this man's arm who's terrified of needles is unnecessary. And it's certainly not reasonably related to the needs of the city. My client was not at that point in time on duty. He was not carrying a gun. All the things that when you have exigency, he had not had a car accident. So this was not a suspicionless test issue. This was he was arrested for DWI, and now I'm going to find out whether he was really drunk or whether maybe something else or maybe something else. Even though I don't really know what it's going to test for, I want you to test it anyway. That's not necessary, and that violates his constitutional rights under the federal rules and the state rules because the state constitution, Louisiana's constitutional privacy rights, are more stringent than the federal. That's been, you know, I cited those cases for you in my brief. But the Louisiana Supreme Court has held that for many years. And the issue is I don't think you've got a reasonable suspicion that he was under the influence of drugs. Not a single affidavit filed said they suspected him of being under the influence of drugs. The affidavits, one affidavit said, well, he, I can't pronounce the N test, but it's the Nix, and I apologize. Jerks a little bit. That could be, and that can sometimes be indicative of pain. Well, medicine. It can also, as we all know, be indicative of alcohol. But what that officer who put that in his affidavit didn't say, nowhere in that affidavit did he say, I suspected him of being under the influence of pain medication because that's the officer who smelled alcohol on my client's breath. And nobody told Chief Shaw they suspected him of drug use. There's not a single affidavit of anybody that the only person who made the decision to stick a needle in my client's arm or he faced termination had any indication that my client was possibly under the influence of drugs, which he wasn't. Isn't pain medication drugs? It can be, Your Honor, but there was no indication that anybody ever told Chief Shaw that they thought that. No, but the officers on the scene suspected that. The officer on the scene said his eye test can be indicative of that. That officer who said that, that officer smelled alcohol on my client's breath. And Nyquil also has, which he admitted to taking, it has some light, although not all the way to prescription pain medicine, but it has some medications in it, too, that can perhaps do those similar things. My client admitted to taking Nyquil because he didn't want to go to jail for DWI. But once he was given his guarantee rights so that what he could say and what happened could not be used against him in the criminal proceedings, he consented to go take a breathalyzer, he consented to take a breathalyzer and consented to give blood, I'm not sorry, not blood, give urine. Those would take care of any articulate needs of anybody who was looking at that situation. That's why we have in Louisiana state statute that's directed to public employees, and that's very similar to what happened in the Richard V. Lafayette Fire and Police Civil Service Board, the 8th, Southern, 3rd, 509, where the courts determined that the failure to notify that city's human resources people pursuant to their written policy negated their reasonable suspicion and that test could not longer be used against that officer. And what here is more, the issue is you stuck a needle in somebody when you didn't need to. And there's, it's undisputed, and this court's held many times that collecting urine and collecting blood, that's a search. I don't think it's disputed, but that's a search. I mean, what you're doing, you're searching. And so there's Fourth Amendment limitations to that. And in order to get around the Fourth Amendment limitations, you have to have reasonable suspicion in the place of an employee. And the reasonable suspicion for drug use doesn't, isn't here. Even if you try to say, okay, because he would smell drugs, it's possible he could have something else, it still has to be, you have to do the balancing test. And the balancing test here is this guy consented for you to take a urine, to give you a urine test. And you tested that urine for drugs. He also consented to a breathalyzer, which showed he was tested positive for alcohol. Therefore, there was no need at that point to stick a needle in his arm. And that, therein, is the problem. That, this client, my client was terrified of needles. He did not, he didn't have a choice. He's in custody, in handcuffs, being told he's going to be terminated if he doesn't give blood. Even the district court agreed that there was issues of fact of whether he consented to a blood test. But in custody, in handcuffs, and told you you're going to be terminated, that's coercion. And he was, to the extent he considered he was consenting, it was coerced. He did not want a blood test. And there was no need for the government to take a blood test. Because they had... Ms. Breedlove, you're repeating yourself now. Is there anything else that you need to share with us? The other thing is that as far as Chief Shaw's claim for qualified immunity, he chose to ignore his own policy. He chose to ignore the city's policy that both required him to contact the personnel department before he ordered somebody to go take drug screening. And that, to me, and he didn't know what he was ordering. He didn't know what it was going to show. I'm just going to do everything. That's not reasonable suspicion. That's not narrowly tailored. That's him, I'm just going to take everything because I said so. And that, to me, Your Honor, that takes away his right to qualified immunity for the claims in his individual capacity. Thank you, Ms. Breedlove. You've saved time for rebuttal. Thank you. Mr. Berg? Good afternoon. I think that the issue really is, as I think we've discussed so far, reasonable suspicion. It's more than a fishing expedition. It's more than a hunch. But it's less than probable. I can't imagine a set of circumstances that you could have more reasonable suspicion of some type of substance other than alcohol. We know we have it for alcohol because we do have the odor. With respect to how this all started is pretty important. And I think that it was a little bit soft-souled as to the details. A citizen complains that an officer in a marked unit is acting unusual, acting bizarrely. He's banging on the door of a house and then sat down and appeared to be exhausted after doing so. Now, we know he's not on duty, but he's in a marked unit. He claimed, and the record is clear on this, he claimed that he was going to talk to the occupants about warrants. And then he later claimed, well, I was on the way to the gym. Well, the warrant would obviously be some kind of law enforcement related. But we know that an officer in a marked unit is, the possibility of him becoming involved in some law enforcement activity is pretty likely. Or it's not unusual. So that's why these rules are so important. So then we have the citizen complaining that there's some unusual behavior going on with this guy. The officers that first encounter him, he tells them, it's all on MPS, on the mobile video system. He tells them, I'm not drinking, I haven't had any alcohol. And the citizen actually watched him drive away. Right. Right, after he got up from the porch and the citizen even talked to him. So he's telling these officers that first arrive in response to the call, and I'm on one call, that I haven't had any alcohol, but I have had allergy medicine and NyQuil. Well, obviously those are substances that could be impairing, I guess. But I think it's pretty easy to understand why more than simply a urine test would be appropriate, or more than a breath test would be appropriate. And that's why the reasonable suspicion is the answer. If there's reasonable suspicion of something, some substance that may be impairing the officer, then there's no dispute that the policies would permit the taking of blood under those circumstances. With respect to what Chief Shaw knew, I think the record, the affidavit is pretty clear. He doesn't know exactly what it is, and he was candid and truthful when he's testifying about that. That he knows it's a substance. He used the word NyQuil. He obviously knew that the guy was claiming to have taken NyQuil. If you look at his deposition, he says, I don't know if it was NyQuil, if it's alcohol, if it's something else. But I know that blood tests more than other things. He's not a scientist, but that's a commonly known issue. You get a urine test, it's going to test for metabolites, we know that. You get the blood, it could test for other substances. And he just wants to make sure we know exactly what's going on. Again, he denies using alcohol, but something's going on. Does the record reflect what the breathalyzer test revealed? You know, Your Honor, I don't believe it did. And I was looking at that last night. The negative drug screen is in there, but there was no dispute that there was a positive alcohol. And I apologize, I can't tell you that right off the top of my head. There are several other field sobriety type tests that were done that would be indicative of something. With the suggestion that no officer believed it was anything but alcohol, you just have to look at the MVS and you hear contemporaneous officers talking about this. Vishnevsky says, I think he's on pain medicine. That's not made up after the fact. That's contemporaneous recording from the mobile video system of them trying to figure out what is this. He says it's not alcohol. And we know that when Carolyn Deal, the detective who takes him for the administrative part of this, she's on the phone with the chief while she's talking to him. So there's a lot of interaction between the chief and these officers as to what they've got here. It's a pretty important circumstance and a pretty big deal to have an officer under these circumstances acting like that. With respect to the consent issue, I'm not quite sure I understand that he consented to some but not all. The MVS captures him saying, do I have to do the blood? And she says no. Well, he knows. He's an officer who's been employed at Houston and Shreveport. He knows. It's a veteran. Nobody can suggest that in an administrative setting you can be held down and blood drawn from you. That's not a realistic claim to make. Clearly he was given his garrity warning. He testified that he understood the implications of garrity. He's being directed to do this. If he doesn't do it, there could be administrative ramifications. Whether he would have been terminated or not, who knows. But obviously it would be a serious thing to deny the request of the agency. Because at this point, he's refused the sobriety test. He's been taken to the DUI unit. He's refused that. He's refused to give breath in the criminal or urine in the criminal. So at that point is when Diehl does the garrity, which is just this can't be used against you criminally. I know that there was a lot of briefing below about the special needs test, and I think that was really kind of a fallback position in the sense that this is clearly reasonable suspicion. But for the federal claims, even if it's not, there is a triggering event here. And under the policy, you could test without reasonable suspicion. The triggering event being an investigation of possible misconduct associated with this. That's the 100.12 of the city policy on that. So even if there wasn't reasonable suspicion, for purposes of the federal claims, you've got a Skinner-type setting where safety-sensitive person with a triggering event. It's not just an arbitrary setting. I'm going to pull this guy in and make him do this. You've got a reason, and that's what Skinner was. In that setting, it was the accident policy. Shreveport has an accident provision in there, but it's also got other circumstances where administrative investigation occurs. So that was really kind of a ñ it's not necessary for the court to get to that point if there's reasonable suspicion of a substance other than alcohol. With respect to the contacting of the HR, somehow that would invalidate all this. One thing I didn't want to forget, we know he's not complaining that he could get his job back. There's not a dispute. This isn't a termination claim. It's simply the search or the seizure part of this. But with respect to the you didn't contact HR, I suppose that if anything it could invalidate some of the tests perhaps. But what's really important is that provision says it has kind of a under-the-circumstances kind of language. You contact HR and they'll oversee the testing, depending upon the circumstance I think is what it says. Well, these circumstances isn't a Department of Water and Sewage worker who they found sleeping and suspect he may be on something. This guy has already been charged with arrested for DUI, and they're trying to figure out administratively what's going on. So it's not that that particular provision is really there's no causation element there for us. With respect to the reasonable suspicion essentially answers all the questions, and I don't want to repeat myself. That one I think could not be more clear to me. I can't imagine a circumstance under which you would have more basis to ask for a drug test unless you found him with some drug paraphernalia perhaps, or you found him with someone saying he smells like marijuana or something like that. For kind of a circumstantial case, denying that he's drinking is pretty important. But we know he's on something, and I think it's unreasonable to suggest that a conscientious police chief should not be entitled to use whatever tools that policy would permit, one of which is a drug test. If the court has any questions, I'd be glad to. All right, thank you, Mr. Byrd. Breedlove, you saved time for a bottle. Just briefly a few things. Carolyn Deal, who he talked to about, you mentioned that was on the phone with the chief and could hear things, was not out at the scene. She's an IA investigator. She was called and told to go to the jail and pick my client up. So she didn't see or hear what was being said out on the scene. There's no evidence that the chief knew about this. To trigger an event, an IA investigation doesn't trigger just a suspicionless search. It doesn't overrule the requirements of the SPD general orders regarding what you must do for a drug screening, which required the chief and the police department to contact CDHR. And the logical reason for that is because the CDHR people might actually be able to understand what is necessary to be tested at that time instead of the chief just ordering everything, when he's never done that before, to any other officer, despite other officers probably being arrested. They say the first officer ever been arrested for DWI. So who are you saying should have been contacted? The city's human resources department. So you contacted the department? He was responsible for calling, because there's a city-ish report, HR department. And he was supposed to contact somebody over there before he ordered a drug screen, according to his own general orders, as well as the city-wide drug screening policy, which was generated in accordance with the state statute to test public employees for drugs. And he didn't do that. He did not call CDHR and say, hey, I want to have this officer drug tested. What he did. I guess as a practical matter, my concern would be if I happen to be an officer and I got picked up late on a Friday afternoon and they wanted to get a drug test, there may not be anybody in HR until Monday. So do I have to be detained until Monday, or do I get to go free? So they call HR and have a meeting in HR. Well, HR, I mean, I'm sure the chief has that he can call those people, the head of personnel, they can call her on her cell phone if that's necessary. But he needed to contact somebody. It's not like 20 years ago where you only had to be in the office before you can call somebody. Everybody's got cell phones these days and house phones, contact numbers. And you're talking about the exigency. The chief could have ordered the breathalyzer in their urine, which was consented to, and waited until he got a hold of somebody in HR before he ordered blood to be drawn. I mean, as we all know, blood, things dissipate in blood at a much different rate. Waiting overnight to talk to city HR was not going to prevent, not going to change the results of that blood test, nor would allowing my client to contact his attorney, as he's allowed to do under civil service law, that would not have changed the blood test. The blood test wasn't necessary. I don't believe you have reasonable suspicion for drug use, but even if you do, the balancing test wasn't met because there was no need to stick a needle in this man's arm. All right. Thank you. Thank you. The case is under submission. That's the case for today, United States v. Patterson.